Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

for the

Southern District of Mississippi

Southern Division



SOUTHERN DISTRICT OF MISSISSIPPI
FILED

OCT 28 2024

ARTHUR JOHNSTON
BY_____ DEPUTY

|  |  |
|---|---|
| Kow-Ching Chang, *aka SAM* | ) |
| | ) |
| *Plaintiff(s)* | ) |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) |
| *please write "see attached" in the space and attach an additional* | ) |
| *page with the full list of names.)* | ) |
| **-v-** | ) |
| | ) |
| | ) |
| Mississippi State University | ) |
| | ) |
| *Defendant(s)* | ) |
| *(Write the full name of each defendant who is being sued. If the* | ) |
| *names of all the defendants cannot fit in the space above, please* | ) |
| *write "see attached" in the space and attach an additional page* | ) |
| *with the full list of names.)* | ) |

Case No. 1:24cv334 HSO-BWR

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* ☒ Yes ☐ No

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

I. **The Parties to This Complaint**

A. **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

|  |  |
|---|---|
| Name | Kow-Ching Chang, *aka, SAM* |
| Street Address | 2600 N 8th Street |
| City and County | Ocean Springs |
| State and Zip Code | 39564 |
| Telephone Number | 701-388-9486 |
| E-mail Address | changsam99@yahoo.com; sc1690@msstate.edu |

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

**B.** **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Mississippi State University |
| Job or Title *(if known)* | President, Dr. Mark Keenum |
| Street Address | Office of the President, Lee Hall, Suite 4000 |
| City and County | Mississippi State, Oktibbeha County |
| State and Zip Code | Mississippi, 39762 |
| Telephone Number | 662-325-3221 |
| E-mail Address *(if known)* | President@msstate.edu |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Telephone Number
E-mail Address *(if known)*

## C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | Experimental Seafood Processing Laboratory |
| Street Address | 3411 Frederic Street |
| City and County | Pascagoula, Jackson County |
| State and Zip Code | Mississippi, 39567 |
| Telephone Number | 228-762-7783 |

## II.    Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☒    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☒    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Other federal law *(specify the federal law)*:

☐    Relevant state law *(specify, if known)*:

☐    Relevant city or county law *(specify, if known)*:

### III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐    Failure to hire me.

☒    Termination of my employment.

☐    Failure to promote me.

☐    Failure to accommodate my disability.

☒    Unequal terms and conditions of my employment.

☒    Retaliation.

☒    Other acts *(specify)*:    A combination of the termination of my Directorship (a part of my employment) in the middle of a contract year, and making the job conditions unfavorable, and retaliation after my filing of discrimination complaints.

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

Starting in 2014 and intensified on August 19 2022, and on-going. Will describe in more detailed in section E, Factual Materials.

C.    I believe that defendant(s) *(check one)*:

☒    is/are still committing these acts against me.

☐    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☒    race _____

☐    color _____

☐    gender/sex _____

☐    religion _____

☒    national origin _____

☒    age *(year of birth)* _____    *(only when asserting a claim of age discrimination.)*

☐    disability or perceived disability *(specify disability)*

_____

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

      E.       The facts of my case are as follows.  Attach additional pages if needed.

1.    Background Facts

I, Kow-Ching "Sam" Chang, the plaintiff, am a 72-year-old Asian/Taiwanese male resident of Jackson County and Ocean Springs, Mississippi. I was born and raised in Taiwan (country origin) and became a naturalized US citizen in 1990. I had established an outstanding record of leaderships in both academia and in national professional societies at the time of hiring. I was hired on June 1, 2012, as a tenured Professor and Head of the Department of Food Science, Nutrition and Health Promotion at Mississippi State University (MSU) through an opened national and international search. I believe never before a Taiwanese-Asian had attained this level of honor in the history at MSU. I believe I was the only minority among all positions of department heads in the College of Agriculture and the Mississippi Agriculture and Forestry Experiment Station (MAFES). In this position, I also served as the Project Director/Principal Investigator for a large Food Safety project funded by the USDA-ARS, because previous director, Dr. Benjy Mikel (a food scientist, White, US-born), left the Agricultural College to become the Associate Vice-President for the MSU's International Office, and because I had the best qualifications for this project.

On August 14, 2014, Dean George Hopper (White, US-born) started discrimination against me by widely broadcasting my annual performance evaluation for 2013 to all faculty, staff and even visitors in the Department of Food Science, Nutrition and Health Promotion (Exhibit #10 of my Rebuttal Response to MSU position paper 09072024). Annual evaluation is of a confidential document and has never been broadcasted for white race and US-born department heads or professor in the history of our department. In that e-mail, he indicated my next evaluation for the year 2014 was going to be in the spring of 2015, thus implying satisfactory performance for the year of 2013. The e-mail message contradicted the claim of Mr. Brett Harvey (Director of the Office of MSU Civil Rights Compliance; White, US-born) in his later statement in the MSU position paper. Collegiality had never been a problem of me. When I came to the department, I succeeded a very challenging department (a hot potato) that had many internal issues among faculty of different factions. In addition, Dean Hopper micromanaged the request of one of my supervisees for a large salary increase in a counteroffer deal without informing me as the Head. This is a no-no in academia since it undercut the authority of the Head as a departmental leader. I disagreed with Dean Hopper's micromanagement style, and he was not happy. This kind of micromanagement operation, showing a total lack of respect for my head position, did not happen to other heads of the white race or from other national origins. I believe I was the only minority serving as the head of a department in the College of Agriculture. Dr. Hopper's action to terminate my headship came on August 30, 2014 (in the middle of a contract year), only 16 days after he publicly broadcasted that I would be reviewed again in 2015 without any written reasons. He orally communicated with me that one of the employees took a maternal leave due to a difficult delivery of a baby without submitting a written leave request. Even though it was not my fault, Dean Hopper blamed me for the failure to prevent that to occur. This should not have been a major cause for running a department with several hundreds of people. I believed there were some hidden agenda. I have explained in my Response letter to MSU position paper earlier submitted to EEOC. However, Dean Hopper retained my directorship for a major USDA-ARS food safety project of about $900,000 each year, so I could continue without disruption to help MSU enhance food-safety research capacity that I had done well since 2012. I did not file a discrimination complaint. In retrospect, I should since my replacement by Dr. Marion Evan (White, US-born) with much less qualification. When I served as the head of the department, Dr. Evan had applied for an advertised assistant professor faculty position.

On February 1, 2018, Dr. Chang was reassigned to become the Director of the Experimental Seafood Processing Laboratory (ESPL) in Pascagoula, to revitalize the seafood utilization research program. Before my arrival, the processing laboratory had been badly destroyed by multiple hurricanes and had been vacated. This position was required to report to two persons: (1) Director of Coastal Research and Extension (CREC) for daily operation and (2) Associate Director of MAFES for research program development. A very important objective of this position was to develop a nationally and internationally reputable research laboratory from basically nothing. Dr. Chang had done an excellent job in developing ESPL to meet the expectations.

From 2018 to 2023, I was totally ostracized from participating in departmental faculty meetings, committees, access to graduate student applications, and decisions making in my home department of Food Science, Nutrition, and Health Promotion. Up to date, I am still being excluded for reviewing graduate student applicants.

In late 2022, the new Dean of the College and MAFES Director Dr. Scott T. Willard (referring to Dean Willard hereafter in this document) and my immediate supervisor, CREC Director Dr. James Henderson began to discriminate against me due to my race and national origin.

Without warning (prior appointment for a meeting), HR representative Bill Branch (White, US-born) and Dean Willard visited our laboratory on July 26, 2022, and gave an order without giving any reasons that I could not have new staff supervisory roles under my directorship, and could not order equipment that had been pre-approved by the Dean in a USDA-catfish project, which I authored and served as the Principal Investigator/Project Director (PI/PD). At this time, I was made to believe that was to stop hiring new staff until further notice since we had two offers to a couple graduated from University of Florida, but temporarily working in Canada and they could not come due to immigration issue during the pandemic period.

On August 19, 2022 (in the middle of the employment contract year), in a meeting in his office, Dean Willard prepared a 'termination' letter and forced me to resign from my director position, which carried an annual stipend of $12,000. Dean Willard stated that he would give me an honorary title of Director 'Emeritus', which is traditionally given to distinguished professors or directors at the time of retiring. I told Dean Willard that I was not ready to retire. Dean Willard responded that I should retire and do gardening. Parallel to his offer of 'Emeritus' status, Dean Willard concomitantly reduced my research workload (from 100% to 33% workload contribution) by taking away a large USDA-ARS catfish processing and utilization project (pre-approved for 2022 to 2025) for which I had been the PI/PD since 2012. and by restricting my right to hire new staff to work on my research. In the termination letter, he stated I would continue to supervise two existing research associates (Dr. Yan Zhang and Dr. Benny Park) and could hire only one new support staff, a research associate or a postdoctoral fellow on my grant funds. Dean Willard took the actions despite the fact that I informed him during the meeting that my annual job performance evaluations were outstanding in the recent two years (2020 and 2021). No reasons were offered in the termination letter, but he stated verbally that I had done very well in the last four years, and it's time to make a change to move on to the next chapter (Sub-Exhibit 3 of Exhibit #1 of the Chang's Response to MSU position on 09072023). Dean Willard—who was being in a very loud manner, and whose fingers were shaking, tried to look very intimidating when I told him that my past performance reviews were excellent, and there was no need for this. These events revealed the calculated motive of the Dean to force me to resign totally from the University. The adversary, disparate treatments made the environment hostile and unfavorable for me to carry out my work under tremendous distress, and that had not been done to other faculty members (white race or from other nations of origin) in similar positions in my departments.

On January 2, 2023, I filed an equal-opportunity grievance to MSU President Dr. Mark Keenum (White, US-born) that I was being discriminated against due to minority status, age, hostility, and retaliation.

On January 10, I learned from VP Coble's letter that they gave the ESPL director position to a substantially younger and less qualified candidate, Dr. James Henderson (White, US-born), who was the CREC director, and a faculty member. I contend that Dr. Henderson is substantially less experienced and less qualified. In fact, Dr. Henderson is a forestry economist, not a food scientist or engineer, and has zero experience in experimental seafood processing, and not qualified to direct experimental seafood processing research projects. Forcibly giving the project I authored (my intellectual property) to another person without qualifications is a very serious matter, is plagiarism and robbery of my work, not acceptable in the academic community and a research misconduct against federal law. Such action was very serious since it caused erosion of trust among colleagues, and between researchers and the funding

agencies, and caused damages in public confidence in the ability and integrity of the researchers. No others in similar situations have been treated in this horrible way during the contracted period, exhibiting discrimination against me on the basis of race and age.

On January 10, 2023, Dr. Keenum asked Dr. Keith Coble (White, US-born), Vice-President for Agriculture, Forestry, and Veterinary Medicine, who was the supervisor of Dean Willard, to investigate my grievance. In his decision-letter, VP Coble did not describe any causes for the termination action that were related to the personnel management issues. Instead, VP Coble confirmed the reason was the hiring of a temporary director (Dr. James Henderson), to serve as a co-principal investigator (co-PI) for the major USDA-ARS catfish project, and I was not being removed as a PI (Principal Investigator/Project Director). VP Coble misled me since Dr. Henderson was later named the PI by Dean Willard, who reported to VP Coble, to replace me, and I was downgraded to a co-PI, and they added another co-PI (Dr. Yan Zhang, Chinese, born in China, a communist country, different from Taiwan which has a democratic country). The adversary actions of Dean Willard contradicted with the letter of the VP Coble in demoting me to a co-PI. Please note that a research project can only have one PI, serving as the project director, but can have multiple co-PI's with less responsibility than PI. In his letter, VP Coble requested me to give Dean Willard an opportunity to succeed. Quite sarcastically, Dean Willard had not allowed me an opportunity to succeed. Please note the tremendous power differential between me and the much higher ranked administrators of the Dean and Vice-President. I believe this is a slavery mentality in that a good person is forced to take the adversary actions (victimization) for the benefit of his master. Please note that Dr. Henderson has been acting as the ESPL 'temporary' director for almost two years, and the university has no signs to hire a permanent director. As the PI, Dr. Henderson, in collaboration with Dean Willard had recently extended the project's duration from 2025 to 2027, meaning that Dr. Henderson will serve as the Project Director until 2027. VP Coble's investigation letter was included in the Exhibit #22 of Chang's Response submitted to EEOC on September 7, 2023. Please note that the extra step of investigation by VP Coble was not in accordance with the procedure of MSU policy. During VP Coble's investigation, he did not interview me, therefore, denying me an opportunity to rebut/explain in person.

Around January 10, President Keenum handed my complaint to MSU Office of Civil Rights Compliance to investigate my discrimination complaint. Mr. Harvey Brett (White, US-born) was the director of this office.

On February 21, 2023, Dean Willard and Dr. Henderson retaliated by intensifying restrictions on my work after my complaint to President Keenum by contradictorily removing my two full-time technical supports (Dr. Yan Zhang, Dr. Seongbin (Benny) Park) that Dean Willard allowed for me to supervise in his termination letter of August 19, 2022. Dean Willard and Dr. Henderson further made Dr. Yan Zhang to supervise Dr. Benny Park and allowed them to work on my ideas, my research projects. This was essentially giving all my supervisory role as well as my research projects to a substantially younger, non-faculty staff, Dr. Yan Zhang, who had much less experience and qualifications, thus also proving an age discrimination against me. This adversary action produced a backbreaking 'chokehold' on my academic career by cutting abruptly all my on-going research activities. Please note at this time, Dr. Zhang was in a postdoctoral associate (a temporary non-faculty, non-professorial rank) position, and was one my recent graduate students for his MS and Ph.D. degrees and was my supervisee, working 100% on my federally grant-funded soymilk project. This action disrupted my soymilk project greatly. Besides, Dr. Zhang did not have proper expertise to supervise Dr. Park. Relevant to this action, in May of 2023, Dean Willard and Dr. Henderson purposely created a new position of Research Scientist (non-faculty position with substantially higher salary than the postdoctoral position and reports to Dr. Henderson directly) for Dr. Zhang without conducting a proper search process (to give him a favor) to take on the workload reduced from my job. This favoritism was done in part due to the motive that they wanted to show Dr. Zhang was a Chinese, as a smoke screen to refute my discrimination claim, but this was done only after I filed discrimination claim. An equal opportunity institution uses open recruitment procedures by law, including a job description, advertisement, the use of a staff search committee to screen candidates, giving a seminar, and interviews. Normally, a recruitment is announced in the

department and goes through a national search via the HR office to seek the best-qualified applicant to comply with the equal opportunity policy. The violation of the policy showed that MSU's autocratic actions were not taken in good faith and truly with an ill motive to make me look bad by hiring my former student and current supervisee to do the work that they cut from me to retaliate against me after my filing of complaint to the President. This has caused a lot of distrust among us and made the environment difficult for to continue my research. By the way, my complaint is about abusive treatment by MSU, not by Dr. Zhang. This kind of adversary action has never been done to a white faculty in the same situation, showing a disparate treatment against me, as a minority.

On February 27, 2023, through an e-mail, I informed Mr. Harvey of the retaliations and abuse of the power of Dean Willard and Dr. Henderson and their violations of research conduct during Mr. Harvey's investigation. This was also discussed during our second interview on April 6, 2023 through Webex.com. Therefore, Mr. Harvey was fully aware of my claim of retaliations after my filing of the internal grievance. This was contradictory to Mr. Harvey's claim on page 7 of his MSU position paper submitted on August 10, 2023.

On April 20, 2023, MSU Civil Rights Compliance Director, Mr. Brett Harvey took unduly time (more than 90 days from January 10) to investigate my claims that violated the MSU policy of 60 days limitation. Counting from my grievance submission date of January 2, it took 110 days, way longer than that stipulated in MSU Civil Rights Compliance policy. During one of my interviews with Mr. Harvey, he was intimidating by screaming at me that was threatening. Mr. Harvey stated that termination of my directorship was a 'non-renewal,' which was not factual since it occurred on Aug 19, 2022, in the middle of an annual contract, which had been signed by the President before June 30, 2022. Mr. Harvey then compiled several non-factual allegations of my supervision of my advisees as a pretext for my directorship removal. Except one incident, I had not been informed of any allegations from my supervisees. In fact, MSU's allegations of multiple incidents were the first time I have ever seen on paper. I disagreed with the unfair decision (Exhibit 25 of Chang's Response to MSU position), and requested further investigation by the university Provost, who was the no. 2 most powerful person in ranking only below the President.

On May 8, 2023, Provost David Shaw (White and US-born) stated he had investigated my grievance appeal. His official letter did not state any wrong doings of my work. However, he asked me to take the termination of the directorship as an 'opportunity' for me to focus on my successful research. I did not see the abrupt termination of my leadership position, which I had done well, was an 'opportunity'. Dr. Shaw had not acted in good faith and his unfair statement badly hurt the principle of equal opportunity, was insulting to me a hard-working professor. I had been doing well as a great researcher when I carried the directorship for several years. In reality, the abrupt reduction in my workload by taking my technical support away has greatly damaged my ability to conduct research. In addition to the improper statement of the discrimination and retaliatory acts as an opportunity, Provost Shaw erred in stating that removal of my director position was to allow me to reduce the burden of overseeing a 'department,' which was not true and contradictory to reality since the Experimental Seafood Processing Laboratory is not a department, but a small research laboratory within the Coastal Research and Extension Center (a department). His wrongful statement proved that he did not even read my grievance materials before making his decision. This showed that he failed to fulfill his duty as a Provost to take my appeal seriously. In the meantime, Provost Shaw denied my request for an opportunity for a due-process investigation by a senate-faculty committee. Provost Shaw told me that I had exhausted the grievance procedures within the university. Please note that all intramural investigations were only conducted by administrators without any faculty input. I informed the President that I was compelled to file a complaint to EEOC, and he did not respond. In the handling of my appeal, I strongly felt the university president had an intentional negligence in his duty as the President since he relied the decisions only from his administrative staffs without giving proper due process. University President needs to take responsibility of the failure of the university.

On June 7, 2023, I filed an EEOC Charge of age, national origin, and retaliation against MSU.

(Attachment A).

On July 12, 2023, I amended my EEOC Charge to include race as a third category of discrimination. (Attachment B)

On August 9, 2023, in response to my EEOC Charge, MSU submitted a Position Statement to the EEOC.

On September 7, I submitted a detailed rebuttal response, containing 32 exhibits to MSU Position Statement to EEOC.

In June of 2023, my pay raise in % for the fiscal year of 2023-24 was lower than my colleagues at ESPL who were paid by the same sources of funding, despite my outstanding evaluation.

From 2023 to date, Dr. Henderson, PI for the USDA-ARS catfish project (taken from me in early 2023) with 34% credit, intentionally kept me (33% credit as a co-PI) out of the decision-making process for the project.

On August 26, 2024, I received a notice of the Right to Sue Mississippi State University from the Department of Justice and EEOC (Attachment C). At the same time, MSU received a copy of the notice.

On September 3, 2024, I learned from a new researcher on the first day of his job that Dr. Henderson gave my supervisory role for his position to work on a federal competitive grant for soymilk quality improvement that was secured by me as the Project Director to a co-PI, Dr. Yan Zhang, who was substantially younger with less qualification, putting me in an unfavorable condition. This disparate treatment had never been done to a white professor in our department.

On September 16, 2024, I sent an objection letter (Attachment D) to Dr. Henderson and informed the President and the Office of Civil Rights Compliance about the heightened retaliation situation. In my objection letter, I also posed a question directed to the University, specifically addressing the allowance of Dr. Henderson to dictate the use of the ARS-catfish grant fund for which he served as the PI (taken from me earlier), even if he had only 1% higher credit than me as a co-PI, but less than the 66% of total co-PI's credit (sum of 33% credit of each of two co-PI's). In comparison, in the soymilk project, I (as the PI) have 70% credit, yet he gave that supervisory role to a co-PI, Dr. Zhang with 30% credit. This was a tremendous disparate treatment in that a white faculty with 1% credit higher than that of the co-PI could dictate the use of fund of a catfish project, even if for unknown, uninformed purposes not relevant to the catfish utilization, whereas I, a minority faculty with a majority credit for a soymilk project could not carry out research according to a pre-approved proposal in supervising a postdoctoral researcher. A letter (Attachment E) from Dr. Lowell D. Satterlee, a national expert and former food science and agricultural college leader provided a testimony about this extremely unfavorable treatment as having originated from a hatred mentality. Simply put it, MSU administrator hated me so that they conduct to such an extreme extent of retaliation against me. In addition to the retaliation motive, the university also committed age discrimination. I, a tenured professor, belong to a protected age group of those aged 40 years or older. Giving my legitimate supervising role, as the PI for a federal grant project to a substantially younger scientist (Chinese, China-born) with much lower qualifications was insulting, proving an invidious motive, thus substantiating a prima facie case of age discrimination according to according to ADEA of 1967.

On October 24, 2024, I amended my claim in the objection letter to include discrimination against me on the basis of age and race.

On October 25, 2024, new Civil Rights Compliance office Director, Ms. Lateshia Butler (Black, US-born) and HR representative Mr. Bill Branch interviewed me for my claims of retaliations and discrimination on the basis of race and age. No conclusion was made at the meeting. A meeting

minutes was prepared by me and sent to both Mr. Butler and Mr. Branch, who replied to acknowledge that he had received the minutes and appreciated my perspective from the meeting.

2.      Rebuttal to MSU position

A detailed response with 32 exhibits and 10 sub-exhibits had been entered in the EEOC case website on September 7, 2023. Here, I am highlighting selected allegations of MSU, and my response to show that MSU positions were often contradictory to their own points/actions, showing a lack of good faith.

MSU's Position Statement alleges that "In August 2022, Dr. Chang was allowed to resign as head of MSU's Experimental Seafood Processing Lab (ESPL), along with all other directorships he held, in lieu of removal from those positions. Chang retained his status as a full professor."
My response:
On August 19, 2022. I was forced (not simply 'allowed' since Dean Willard already had a termination letter printed in his hands in the beginning of the meeting, and if I did not resign, he would have terminated me immediately as he stated.) to resign from the ESPL directorship and I was offered a Director-Emeritus position. Since I am a tenured professor, Dean Willard could not single-handed terminate my professorship by law. However, parallel to the offer of 'Emeritus' status, Dean Willard concomitantly reduced my workload (thereby restricting the number of my technical support staff, workload, responsibilities and taking away a large research project) to make me feel useless. The reduction of my workload and technical support, corroborating with the offer of the Emeritus status, was a calculated act to compel me to retire from MSU. In the decision-letter after a long overdue investigation, Mr. Harvey described my resignation as a 'non-renewal,' which was an intentional fabrication as a pretext for the discrimination acts. No one in the academic world would implement a 'non-renewal' of any directors in the middle of the contract year since 'non-renewal' occurs normally at the end of a contract year. Terminating the directorship in the middle of the contract year has caused great damage on my work, the progress of the entire laboratory and my health.

MSU's Position Statement alleges that "Chang claims this decision was due to his age and national origin, which is Chinese. In reality, it was due to grave concerns spanning at least five years over his inability to manage personnel in a professional or civil manner. Numerous faculty and staff of various backgrounds, including those of Chinese national origin, raised complaints about Chang's workplace bullying and unprofessional conduct. More specifically, multiple ESPL employees resigned citing Chang's behavior as the cause. One Chinese visiting scholar checked into a hospital due to suicidal ideation because of Chang's constant beratement. In Spring 2022, another researcher – also of Chinese national origin – left citing Chang's "misconduct," "harassment," and "verbal intimidation."
My response:
All behavioral allegations were not factual and only compiled after I submitted the internal discrimination claims. I have never bullied anyone in my life. No previous incident reports from MSU for each of the claims in terms of time and date of each occurrence, evidence/substance and any blames on me in a timely manner. In fact, it is easy to know just by asking MSU to provide any timely incident reports, made by a due process that includes time and date, nature of evidence, actions taken and my response for each claim). A lack of due process deprived me the opportunity to defend/rebut for each claim. In fact, I did not agree a job performance evaluation of 2019 due to unfair statement that was not reflective of my performance due to the fact that MSU only took the false accusations at face value rather than studying it more closely by failing to consider explanations and providing any witnesses. I have done nothing wrong. I had performed faithfully to fulfill my job duties to correct the under-performance of some supervisees in a professional manner in order to build national and international reputation to fulfil my duty. With the exception of 2019 (Dean Willard was not the Dean at that time), two years in a row (2020 and 2021) leading to his termination action, my job performance ratings, including leadership as the ESPL Director were outstanding/excellent. In addition, I had received peer-reviewed outstanding research awards, in which leadership was one of the award criteria. Many support letters from my former students or associates had been submitted to the award committee (Exhibit 1 of Chang's Response to MSU position, Sub-Exhibit 10 in my original grievance to MSU president) on my

behalf to attest for my excellent leadership and scholarship. Contradictorily, during our meeting, Dean Willard literally and loudly praised that I had done well for four years as a director in front of me and Dr. Jaimie Larson (White, US-born), an associate director working under Dean Willard, without citing any factual misbehavior. I had documented this fact in the meeting minutes (Exhibit 1 of Chang's Response to MSU position, Sub-Exhibit 3 in original grievance submitted to MSU President) in my original complaint submitted to the MSU President on January 2, 2023.

Among the persons alleged in the MSU position paper, two were not my supervisees. They were support staff members, reporting directly to Dr. James Henderson, who was housed in Biloxi, and visited our laboratory in Pascagoula only occasionally, and could not have the first-hand information of our activities at our seafood laboratory. Dr. Henderson assigned work for these two persons and evaluated them. I had no influence on their work. In fact, because they reported their work directly to Dr. Henderson, they did not always respond to my requests for help in a timely manner. Dr. Henderson should be the one to be responsible for any failures which occurred. I did not know their complaints only until after filing charges to the EEOC.

Two other supervisees, Dr. Haijuan Tian and Dr. Yuwei Wu, were under-performers. The complaints were said by themselves and should not have been taken at face value without confirming with me. No factual materials or witnesses of me committed anything wrong. Instead, I carried out my mentoring with the highest scientific and professional standards that was consistent with the request of the university for its employees to perform with a high standard for achieving excellence. By the way, these allegations are very serious. One would think there would be some sorts of immediate investigations, providing cogent incident reports and actions before making a negative comment in my 2019 performance evaluation. However, MSU's claims were not factual since no evidence/reports to substantiate their claims at the time of occurrence. In fact, Dr. Devendra Bhandari (Originally from Nepal, a Ph.D. from Tennessee State University, with more than one year of overlap time with Dr. Wu and Dr. Tian), who left in October of 2020 for an biotech position stated in two e-mails (Attachment F) addressing to me that "I really enjoyed working with you", and that "You are one of the best supervisors one can really get a chance to work with," and which further stated "It's been a wonderful experience to work for such a great Lab with great people," "Thank you for your guidance," and I would like to thank you again for the opportunity to work with you which will certainly help me throughout my career." (09072023 Chang's Response Exhibit # 19). He copied his messages to all my supervisees, including Dr. Yan Zhang, Dr. Yuwei Wu, and Dr. Benny Park), and a facility coordinator, Mr. Jesse Raley, who reported directly to Dr. Henderson. These complimentary remarks also attested that our laboratory was functioning very well after Dr. Tian left in August of October. Recently, before her departure from our laboratory, a researcher, Ms. Sarah Warren (White, US-born) stated (Attachment G) "I have many opportunities to observe Dr. Chang's interactions with other personnel at work. Dr. Chang is a polite and pleasant person, who tried to support people in the laboratory. I have observed that he not only works hard, but also acts very professionally. He also plays a leadership role in making sure that laboratory is clean and safe, and he does not hesitate to give guidance/input on experimental subjects. Our research has benefited from his long-time experiences and technical help." And she further stated "MSU is fortunate to have Dr. Chang to lead the Seafood Laboratory." In the last five years, I have helped numerous people on and off campus, all except Dr. Tian and Dr. Wu were very appreciative of my advising/help. Please refer to many letters of support for peer-reviewed awards at MSU (Chang's Response Exhibit #1, Sub-response exhibits #8 and 10). In fact, MSU was aware of my excellent leadership, but purposely ignored my contributions that I had successfully mentored many people in the same period, including guiding a student (Mr. Ruiqi Chen) to successfully obtain a master's degree, successfully guiding two other research associates (Dr. D. Bhandari, Dr. Y. Zhang) in their work, and completed three other visiting scholars from China and Taiwan (Dr. Yuxiang Chen, Dr. Li Cui, and Mr. Yi-Cheng Wu) in 2018-2022. They were all very appreciative of my advising and very productive. Two visiting scholars from China (Dr. Y. Chen and Dr. L. Cui) had published high-quality peer-reviewed scientific journal articles based on their work under my ideas, support and guidance.

In fact, Dr. Tian and Dr. Wu were the only unappreciative advisees that I have ever had in my entire 50 years of professional career. I have provided tremendous help to each of them (will provide evidence upon request). I had carefully kept Dr. Henderson in the loop in handling these two persons' progress and behavior during the challenging moments, but Dr. Henderson provided little to help solve the

problems. The following are factual materials regarding these two persons.

(1)    Dr. Tian, a visiting scholar (non-MSU employee) was a habitual liar, who lied constantly, and this had been documented in my E-mail sent to Dr. Henderson and Dr. Wes Burger with a copy to HR manager, Ms. Julie Rester, on April 17, 2020 (Exhibit 17 of Chang's Response to MSU position submitted to EEOC). In fact, after a phone discussion with Dr. Henderson, he agreed to terminate her on March 24, 2020, and asked me to send a draft of termination to him through email (Exhibits 15 and 16 of Chang's Response to MSU position), but the termination plan was not implemented due to travel restrictions during the Covid-19 pandemic in 2020. Dr. Tian's visit to a hospital occurred at a time when I was out of town. I was not aware of the actual cause and if that was due to the stress or her pre-existing conditions. No one showed me any medical reports that attributed to my fault. Indeed, it was not my fault.  I had not done anything wrong. Upon learning that she went to see a doctor, through e-mails, I asked Dr. Wu to help take care of her and her families residing in Ocean Springs and told Dr. Wu that I regarded Dr. Tian as a professional family member. I have explained in my official response to MSU's position regarding Dr. Tian's false allegations of any wrong doings on my part. In fact, the entire episode emerged from a mentoring event in the laboratory when Dr. Tian violated standard operating protocol by failing to label a bottle of chemical sample properly. In fact, I had provided guidance previously in our group meetings about the importance of sample/reagent identification in conducting research.  She did not label the sample by failing to mark the needed information on the bottle that was required by chemical safety policy for any samples to have the identification information of "time & date, name of the person who created it, and the sample name."  Dr. Tian did not mark these pieces of information on the sample bottle. I asked why she did not label properly in a normal conversation manner without raising my voice. I asked her to tell me the purpose of proper identification of samples on the label. She appeared not happy in answering my questions. This was actually a positive mentoring activity on my part since it was extremely important, a lesson '101' to properly label experimental samples in research.  Dr. Tian became upset immediately, and followed by sending multiple unprofessional e-mails, some of them distributed to Dr. Yan Zhang, not relevant to our conversation, revealing her ill spirit.  Very unfortunately, Dr. Tian took my questioning as an intimidation.  In fact, it is a normal mentoring activity with a sole purpose to help her do the right thing. By the way, Dr. Tian lied, and did not provide any witness that I had raised my voice in our conversation. She simply could not since I did not raise my voice. However, without considering my input, Dr. Henderson took her words of accusations at face value, and made a negative statement in my performance evaluation, which did not reflect my performance. Taking Dr. Tian's claims at face value without using a common sense of mentoring before adopting her claims against me was not acting in good faith. In fact, I had kept Dr. Henderson in the loop about what had actually happened, and Dr. Henderson did not raise further questions. It surprised me when he put a negative comment on my 2019 performance review, which I could not accept.

In fact, I had done a lot of work to help her succeed by inviting her to our laboratory, taking her to the main campus for orientation, giving her my best research idea, allowing her to work on a nationally funded catfish processing project, and providing her all laboratory resources for experiments. In fact, I invited her to join my laboratory upon the recommendation of a former visitor, Dr. Hansong Yu (Chinese, China-born), who was a friend of Dr. Tian and had greatly appreciated my mentoring at North Dakota State University and followed me to MSU. In addition to Dr. Tian, there were three other successful visitors from China and Taiwan who had successfully completed their assignments under my guidance in about the same period of time. Her failure could be attributed to her weakness in science (examples such as not knowing how to label a sample, and not knowing how to perform or calculate in conducting experiments) and unwilling to make a sincere effort to solve problems by taking my guidance as an intimidation. It is unethical to take my legitimate guidance as an intimidation or harassment or bullying. To make a simple illustration: Would it be credible for a student to claim that an instructor intimidated her or him for their failure in a test? Of course not.

In one e-mail she mentioned a wife of my supervisees was hospitalized under stress because of her husband working hard, and that seemed to be related to my supervision. In fact, her accusation was a lie. I thought the only wife hospitalized was wife of Dr. Bhandari, who had an infant baby at that time. I checked with him, and he told me his wife had postpartum syndrome, and her hospitalization was not related to me or anyone. In addition, Dr. Bhandari thanked me profusely for my guidance when he left

(Attachment F) for a nice biotech job. In another e-mail statement, Dr. Tian expressed she could not work around the clock. However, that was what she said, not me. MSU took her statement at face value as if I had asked her to work around the clock. In fact, I never asked anyone to work around the clock. Exhibit 12 of Chang's Response to MSU position showed a testimony of Dr. Yan Zhang who had worked with me for about 16 years that I only encouraged people to work hard for their own good, but never ask them to work around the clock. Dr. Tian's e-mail conversations with me as cited by Mr. Harvey in MSU position paper revealed Dr. Tian's ill spirit against me (her mentor) since she copied her complaint to Dr. Yan Zhang, who was not relevant to our interactions, showing her intention to broadcast her complaint to influence other people. I believed Dr. Tian had a mental problem, as manifested by being a habitual liar. Therefore, MSU, using Dr. Tian's claims to go against me after I filed discrimination grievance, was not acting in good faith, particularly when HR vindicated these improper claims, as I will explain later.

(2)     Dr. Wu (Asian, Taiwan-born) showed serious incompetency and committed insubordination (not following my instruction of standard laboratory protocols) by not keeping the laboratory clean and safe, illustrated in my e-mails reported to Dr. Henderson (Exhibits 18 and 21 of Chang's Response to MSU position). In addition, Dr. Wu fabricated data in his dissertation and a manuscript for publication. By federal law for proper research conduct, I reported such misconduct to the administration (Dr. Henderson, with copies to Associate MAFES Director Wes Burger, Dean Willard, VP Coble and Provost Shaw) on July 17, 2021. The university kept me out during their investigation of the research misconduct. I heard from Dr. Henderson that Dr. Wu was given with a disciplinary punishment after the investigation. In other universities, data fabrication can be punished much more severely than that. Since Dr. Wu was the only one who left in 2022, I believe Dr. Wu was the one who made the bad comments as cited in MSU position that "In Spring 2022, another researcher – also of Chinese national origin – left citing Chang's "misconduct," "harassment," and "verbal intimidation." MSU Position cited Exhibit 11 in its text for this incident but failed to attach it in the MSU position document. It is not uncommon that under-performers, liars and cheaters respond unfavorably by making retaliatory remarks at the time of their departure. MSU administration failed to inform me these negative comments in a timely manner, only after I filed the discrimination complaint. Normally, administration would not take these kinds of comments at face value. However, MSU intentionally used these non-factual claims to serve as non-discrimination cause for their discrimination acts. Simply that I had enforced a law of proper research conduct by reporting data fabrication that Dr. Wu might have taken it as intimidation or harassment. In addition, Dr. Wu's annual evaluation for 2021 was very poor, and I recommended non-renewal for the next contact year (July 1, 2022 to June 30 of 2023). Therefore, he chose to leave his job before June 30, 2022, the end of contract year. It was not a surprise that Dr. Wu would make negative comments, but these terms were not of factual materials without specific substances. By the way, Dr. Wu has a uniquely close relationship with Dr. Tian since he stated in one e-mail (Exhibit #14 of Chang's Response to MSU position) that he came to the laboratory in the evenings and weekends to do experiments for Dr. Tian's project. I have never seen this situation in my entire research life unless two persons were in an extremely close personal relationship. By the way, I do not know the true intent for why MSU was emphasizing my supervisees as Chinese, noting that I am not filing a complaint against my supervisees. I am filing against the mistreatments by MSU administration. There are liars and cheaters in every country.

Therefore, the negative comments of both Dr. Tian and Dr. Wu were not factual. MSU purposely put together their false allegations without using fair judgements only with an aim to use these none-factual comments as a pretext to conceal their discrimination and retaliation acts of terminating my directorship position and placing restrictions in my workload only after I submitted the discrimination claims to the MSU president and EEOC. In fact, I always run the laboratory with the highest professional and scientific standards. I, in no way, was abusive to my supervisees by being upset without no reasons. As a professor, I want all students and supervisees to succeed. Only if they succeed, I succeed as a teacher. All directors and professors have the faculty right/duty to correct supervisees when they see something wrong, just like in situations where we let students know if they do something incorrectly in the laboratory or in their papers. By penalizing me based on these falsified supervising issues, MSU administration denied me this important faculty right - the academic freedom, which is the foundation

for creativity to gain the public trust in university in the use of public fund (state and federal) for education. This is a disparate treatment since no other faculty of the white race or from any other nations in our department has ever been treated this way.

I did not agree with the job performance review comments made by my supervisors for the year 2019. Therefore, I did not sign the evaluation document since I could not accept the unfair judgement on me without seeking my input in a timely manner. My refusal to sign caused the anger of Dean George Hopper (White, US born) to issue an unfair e-mail. Harassment/belittling others is a serious allegation. However, it was contradictory to the fact that Dr. Henderson had never told me that it was my fault when I discussed with him multiple times the e-mails of Dr. Tian. Why did Dr. Willard, new dean, take the adversary actions against me in 2022, three years after the 2019 events, and in the meantime told me that I did my job well and offered me an honorary Emeritus-Director position? These actions did not add up logically and were extremely contradictory in concepts and principles.

There was no evidence that I treated my employees unprofessionally. In fact, after the disagreeable 2019 performance evaluation, which took place in January of 2020, I invited HR to come to our worksite (250 miles from the main campus) to investigate in the Spring of 2020 about the false allegations of my personnel management. Ms. Julie Rester (White, US-born), an HR manager, came to visit with us individually. I appreciated the opportunity for this due process to listen to my explanations. The investigation if conducted immediately in 2019 at the time of Dr. Tian's claims would have been better. Nonetheless, after HR's investigation, there were no convictions of any of the allegations, and no disciplinary actions were taken against me. Therefore, I was vindicated. The fact that the university continues to use these vindicated events repeatedly against me is not only acting in bad faith, but also very unethical and illegal. It is bullying and slandering. Previously, I had serious concerns of severe micromanagement by Dr. Henderson. I requested for a meeting with VP Coble and Provost Shaw through emails in the period of May 19-June 1, 2021, in Chang's Response to MSU position Exhibit #31) to discuss micromanagement and other personnel issues, but they both denied me an opportunity to meet with them without offering a reason.

My performance documents signed by the administrators in the following two years of 2020 and 2021 were excellent/outstanding in all regards (Exhibit #1 of Chang's response to MSU position, Sub-Exhibits 4 and 5 in my original grievance to MSU President), including administration (for directing the ESPL, not limited to personnel), and excellent evaluations existed before 2019. It is beyond my capability to understand why Dean Willard and the university's position continue to deny what they had signed these black-and-white documents of my performance evaluations that my performance was excellent. MSU lied that I had behavioral issues over the last five years in its position statement. I had not done anything wrong. The cases MSU falsely illustrated were isolated cases, not an on-going basis over five years. MSU purposely exaggerated after my filing of discrimination complaint. In fact, Dean Willard told me in my face that I had done well in the last four years in his office, prior to my submission of grievance. Therefore, these episodes were very contradictory. The only reason I feel strongly is that they did not like me as a person. I said this to Dean Willard in the meeting and documented in the meeting minutes of August 19, 2022, in his office, and in other two circumstantial instances, where Dean Willard and VP Coble purposely ignored me, making me feel my hard work is unworthy to be liked by them as my other peers of the white race.

In 2021 and 2022, the university was fully aware that I was honored by the President in two separate award ceremonies. There were many letters praising my efforts in promoting people. In the meantime, I received a national award for being a distinguished leading scientific editor of a major peer-reviewed food science journal, and for being a highly selective consultant of University of Arkansas to conduct 10-year review of its Food Science Department to evaluate their performance in teaching, research and extension, and made recommendations for improvement. Other selected consultants were department heads from Ohio State University and UC-Davis, and Center Director of a major USDA Research Center, and a major food industry. These are just a couple of my many excellent extramural achievements, which happened in the same period of time, but were intentionally ignored by MSU. Please allow me also to mention in 2021-2022, I helped MSU develop a unique food mechanical position, and helped hire a new, young assistant professor (Dr. Wenbo Liu, Chinese, China-born). I have successfully mentored him to secure a lot of grant funds for seafood research. This is just another example in mentoring others (MSU and the faculty) to succeed. Since 2018, I also helped MSU in

securing about eight million dollars for building a new research facility for the Northern Gulf Seafood Research Center. Dr. Liu was very appreciative of my work in a letter to support my nomination for a top MSU research award. These contributions had been documented in my grievance packet to the President and to EEOC, but MSU intentionally ignored, showing no good faith. In the meantime, MSU took about 45% of direct cost from about $1 million of external competitive grants from my effort as the PI. All these grant activities involved intensive interactions with people, and my project success is a role model for juniors.

MSU's Position Statement alleges that "By August 2022, Dean Scott Willard had decided that Chang's behavior could not continue. Dr. Willard and other administrators made the decision to remove Chang as head of ESPL and director of the grant projects he oversaw there, so that he could no longer wield influence over subordinate staff. Chang asked to be permitted to resign on his own initiative as a face-saving measure, and was allowed to do so."
My response:
I did ask for time to resign since it occurred without warning, but my request was done under a terrible threat from Dean Willard. I did not agree that a legitimate extension as a 'face-saving measure,' which has a negative connotation that Dean Willard had no regards for continuity of ESPL seafood research. Dean Willard was fully aware that it would take time to make work arrangements so that the change in leadership would be less damaging than a sudden change without knowing who was to succeed as the director. In fact, the time extension was helpful to MSU to keep the laboratory running smoothly. The sentence that "Dean Scott Willard had decided that Chang's behavior could not continue." was just an attempt to conceal their discrimination acts. This sentence is very contradictory to the fact that he told me I had done well in the last four years as the director and was directly opposite to the facts of my excellent performance reviews for 2020 and 2021 that had been signed by the Head and the Dean. By the way, it extremely intimidating to learn that the mentality of removing my directorship was because I could 'wield influence' over subordinate staff. It is sad that MSU had to fabricate this 'influence' statement. I could not understand this sentence at all. MSU did not provide any factual substance of bad 'influence' that they use as excuse to prevent me from supervising others. Where is the evidence? This is an intentional distortion of my excellent work. The fact was that I tried very hard to help all to do the right things, to help all succeed in experimental science for their career development. As a director and professor, one of our jobs is exactly to make influence over supervisees (I have never considered people working with me as subordinates). It was not factual that I had used advising power to influence them in a negative way. In fact, promoting better science by demanding quality work would give benefits to younger researchers for their entire lifetime and make MSU a better institution.
My relationship with advisees is a life-long affair. I always enjoy teaching/advising and giving my advisees the highest support that I can give. MSU is blind to the fact that my CV (required document for annual performance evaluation) listed several hundreds of publications/meeting presentations that represented my influence and energy devoted to help my students, postdoctoral fellows, visitors and staff. Everyone left with appreciation except the two mentioned. In fact, Dr. Wu and Dr. Yan Zhang thanked me in their thesis and dissertation for my guidance. I had helped them published many scientific articles. In addition, I have helped numerous former supervisees in publishing scientific articles after they left. To give examples of my continuous positive influence on my direct supervisees, Mr. Ruiqi Chen (MSU graduate student of 2016-19, currently a food inspector) published one peer-reviewed journal article with me in 2024, and we are writing the second article; Dr. Yuqing Tan (MSU graduate of 2015 and 2018, associate professor) published two articles in 2024 with me; Dr. Shi Meng (MSU graduate of 2015 and 2018, principal scientist at Nestle) published one article with me in 2024; Dr. Yingying Tan (NDSU graduate around 2010, professor), published one article in 2016 and two articles in 2024 with me, Dr. Baojun Xu (NDSU postdoctoral fellow around 2001-2005, professor and department head) published one article with me in 2023; and Yumei Cao (NDSU graduate around 2000-2001) published one article with me in each of 2002 and 2024. These are just a few examples, not counting numerous supporting letters I have written on behalf of my advisees, such as assisting Dr. Wu and Dr. Zhang in successfully applying for their green cards (US permanent residency) during their time at the seafood laboratory, successfully recommending Dr. (MD/PhD) Guojun Li (NDSU MS graduate of 1990's) for his promotion to the rank of Professor at MD Anderson Cancer Center). These are just

examples of my help on my graduate assistant supervisees. My influence on visiting professors were also phenomenal with several visitors returning home serving their institutions at higher ranks with increased influential capacity. I have too many successful stories to tell in supporting my students and researchers to succeed as I also have alluded that there were many support letters for my award nomination being included in my grievance letter to the President. Why was MSU blind to those facts? By the way, this was also very contradictory to the fact that MSU hired me through a national search with extensive interviews and reference check to become the head for a department of several hundreds of students and employees due to my excellent records in teaching, research and outreach, and contradictory to the fact that I am one of the highly reputable leaders in three major professional societies by being their Elected Fellow, the highest lifetime honor a food scientist can attain in his or her profession.

In our seafood laboratory in the last six years, this misbehavior claim was also very contradictory to fact Dr. Bhandari testify to all people work in our laboratory that he would benefit from my guidance for his career development, and he appreciated working in a great laboratory with great people. Recently, Ms. Warren's comment that I benefited MSU seafood laboratory. In fact, it was contradictory to the fact that MSU hired Dr. Yan Zhang as a Research Scientist, who had been my advisee for about 16 years, from his MS, Ph.D. studies, to postdoctoral researchers in two institutions, North Dakota State University and MSU, if he had been wielded with bad influence from me. If I had wielded bad influence on him, why Dr. Zhang chose to work with me all these years. Dr. Zhang had testified my leadership and support in a letter submitted for the nomination of a top MSU award. His letter was included in one of the (Exhibit 1 of Chang's Response to MSU position, Sub-Exhibit #8 in my original grievance). In fact, Dr. Henderson told me in my office that upon reviewing Dr. Zhang's CV, Dean Willard said to Dr. Henderson that Dr. Zhang owed his career to Dr. Chang. In fact, MSU's intentional, slandering statement of 'wielding (negative) influence' with a sole purpose to defame my reputation to conceal their real intention of discrimination against me was a libel to my name. My work environment and health have been severely impaired after all adversary treatments.

Contradictory to MSU's claim, I have 'wielded' very positive influence on my students and postdoctoral researchers, colleagues, and the food industry. In addition to those I have mentioned, many of my former supervisees have achieved greatly in their positions. Just to name a few: One was a professor and department head and had been the President of the US Obesity Society, another is a vice-president for a university, and several have been in the head or dean positions; and many are in prominent positions of the food industries. In Exhibit #1 of Chang's Response to MSU position and Sub-Exhibit 8 of my original grievance submitted to MSU, six former students thanked my help for their successes along with three MSU professors, two USDA scientists, and one catfish industry. However, MSU was intentionally blind to these letters. MSU cherry picked the events as a pretext for discrimination acts. They only focused on two bad advisees. Instead of punishing me for my good behavior, MSU administration should have thanked me for my willingness to correct the mistakes of them so they would not make the same mistakes in their future pursuit. By contrast, my peer-reviewed awards at MSU directly provided testimonies for my contributions to leadership and scholarship that contradicted with MSU administration's opinion about me. Would anyone believe that MSU administration had conducted their investigations of my teaching/advising in good faith? My recognized national and international reputation as an elected Fellow of three major professional societies also negated MSU's insulting statement to wield negative influence. To date, no other MSU food scientists and very few faculty at MSU have achieved the same level of excellence as I have accomplished. As a matter of fact, I am a graduate of class-10 USDA-ACOP/ESCOP leadership program back in 2000-2001, about two years prior to that of Dean Willard. I had established my reputation long before I came to MSU. North Dakota State University interviewed me for an Associate Vice-President position at about the same time when I accepted the Head offer from MSU. Both NDSU and MSU were recognized in the top-100 research institution category.

MSU's Position Statement alleges that "With respect to Chang's remaining allegations, he is absolutely correct that he was restricted in hiring or supervising new employees after his removal. This was to prevent further abuse of authority toward subordinates."

My response:

This insulting statement was not factual. First, I have never regarding students or researchers are

subordinates, which carries a negative mentality of the administration, who regards people working below them were subordinates. Abusing authority has not been reflected in my excellent job performance reviews or in my entire life. On the other hand, MSU's vilifying my character and negating my job performance after my filing of a complaint was absolutely an abuse of their power in their retaliations against me. This is the most important reason and principle why I wanted to seek justice in the court. All adversary treatments were their maneuver of a 'chokehold' over my career development so that I would leave the university under the unfavorable environment, and the action corroborated with their desire for me to retire along with an 'Emeritus' status. Under MSU's heightened restrictions, I was not even allowed to supervise a postdoctoral research associate hired by my own competitive national grant fund. In my letter objecting to these retaliatory actions, I indicated that Dean Willard and Dr. Henderson gave my supervisory role for one of my competitive-federal-grant-hired research associate to a younger co-PI with much less credit and qualifications. The horrible, heightened 'chokehold' against me happened after I fired a complaint to EEOC, particularly after they knew that I have received 'right to sue.' I have confidentially communicated with four professors (their names kept confidential due to potential retaliation) individually at MSU, including two in our departments, and they all were surprised with such adversary act. Indeed, one professor (White, US-born) in our CREC department described that he had not seen this kind of situations. This is exactly one of the disparate treatments that stimulated me to seek justice.

MSU's Position Statement alleges that "Chang asserts that Dean Willard told him he "wanted to get [Chang] a position in emeritus," implying that he wanted Chang to retire. In reality, when Willard told Chang that he was being removed as director, Chang spontaneously brought up the prospect of retirement. Further, the "emeritus" position Chang ultimately received was an honorary title of "Director Emeritus" of ESPL, which was simply another effort to help Chang save face. He was never asked to take "professor emeritus" status and remains an active full professor to this day."
My response:
As stated earlier, an 'emeritus' status is generally conferred to distinguished directors or professors upon their retirement. As soon as I heard about the Emeritus offer in the meeting, I told Dean Willard I was not ready to retire since I did not know what to do after retiring. He said: "Why not, you could do gardening," a very derogatory comment to an older person, and particularly one of Asian heritage. Nonetheless, if a leader was distinguished to be honored as the 'emeritus' for directorship, why removing him/her. The emeritus-director means a lot; it means that I had performed well during my active duties of the directorship. In fact, Dean Willard said that I had done well in the last four years after Dr. Larson confirmed my performance scores were excellent.
After all events, it showed their true motives for discriminations and retaliations against me were that they did not like me as a person, and that they wanted to gain control of the USDA-ARS grant fund for Dr. Henderson to spend without being checked. In the Objection letter (Attachment E), I stated that Dr. Henderson dictated in the use of fund for questionable purposes, without asking co-PI's for input, even if he had 34% contribution credit, only 1% higher than each of two co-PIs (33% credit each). Please note that Dr. Henderson has no experimental seafood research knowledge since he is a forestry economist. This is very damaging to the university since this situation will lose the public's confidence in the ability of the university to use the fund properly for the best interest of the public. Unfortunately, they accomplished their goals through intentional discriminations against a minority with excellent performance. They were fully aware the tremendous stress that the adversary decision would cause upon me, but they continued to ignore the 'acceptable practice' of the academic communities. No one deserves this kind of unjust treatment. The severe stress inflicted by an on-going chokehold is worse than firing a person. It has destroyed my character and reputation by explicitly showing that I was an unfit professor and director in front of my colleagues. For many nights, until this date, I could not sleep well. I had to visit a doctor and took anti-depression medicine.

MSU position in the paragraph from the last line of page 6, Section II stated "Indeed, the allegations against him could have supported termination of his employment, but instead he was permitted to step down as project head and retain his status as professor and to do so on the accommodating four-month timeline he proposed."

My Response:

This was a blatant threat, a serious form of harassment, discrimination and retaliation, to my long outstanding career since no factual materials to support that I have done anything wrong. It was a lie since I was not allowed as project head (PI). MSU is blind to my outstanding performance evaluation and peer-evaluated/recommended outstanding intramural and extramural awards/honors, and letters attesting my scholarships and leaderships (Exhibit 1's Sub-Exhibit 10 of Chang's Response to MSU Position). To date, unfortunately, MSU continues to distort the fact by stating that I was allowed to resign, but the fact was that I was terminated. Of course, if I had not been in a tenured position, MSU would not hesitate to terminate my faculty position based on the manner it has discriminated and retaliated against me. Sarcastically, MSU stated that I should take the termination of my leadership (a demotion) as an opportunity. Why would not these administrators take 'opportunities' to terminate themselves from their high power/pay positions to focus on their research or teaching interests? This is so unjust since I had worked very hard as a minority to overcome many challenges to move up on ranks in my career, and I had hoped my success would prove the equal opportunity principle of our nation so that would encourage minorities coming from behind to strive to advance their career at MSU.

MSU fabricated reasons with an aim to sabotage my characters. These allegations had no sound basis and were merely set up to conceal their attempt of discriminations by removing a qualified minority employee from a position and give it to an unqualified white, younger, person which constitutes age and racial discrimination, according to the Civil Rights Act and Age Discrimination law.

Please note on the Aug 19, 2022's termination letter (Exhibit 1 of Chang's Response to MSU Position, my original grievance materials submitted to MSU President) written by Dean Willard had not described any reasons for his actions. VP Coble's letter also had not described anything wrong with me. All wrongs were compiled by Mr. Harvey in his Civil Rights Compliance investigation. Workload reduction and further intensified restrictions for me to do nothing but reviewing papers were forms of disparate treatment and serious retaliation to chokehold my progress. Their dislike of me as a person, and the unchecked use of the federal grant fund from USDA were the true motive for discrimination and retaliation. Quite blatantly, they set up the unwarranted allegations after I filed the complaint to the university president and EEOC.

MSU position in the paragraph from the last line of page 7 stated that " Dr. Chang's amended charges listed retaliation as an additional claim, but provides no information to support it. His burden is to establish a "causal connection" between a protected activity and [an] adverse employment action. "Thomas v Tex of Criminal Justice, 220, F.3d 389, 394 (5th Cir. 2000). He has not even attempted to make such a showing."

My response: This is not factual and an intentional falsification. Indeed, after I submitted my internal grievance on January 2, 2023, I was cut off from any supervisory roles on February 21, 2023, that greatly damaged my ability to continue my research and caused tremendous distress to affect my health. I had reported this adverse retaliation against me and a violation of research conduct by Dean Willard and Dr. Henderson to Mr. Harvey through two channels, e-mail on February 27, 2023 (Exhibit 28 of Chang's Response to MSU Position), and our Web interview on April 6, 2023. I copied this e-mail to Dr. Julie Jordan (White, US-born), VP for MSU Office of Research and Economic Development, and to Provost David Shaw (White, US-born). Therefore, Mr. Harvey was fully aware of the retaliatory actions against me.

During the time when I prepared my rebuttal to MSU position to submit on September 7, 2023, I did not have time to review the four legal cases that MSU cited in the MSU Position Paper. In May of 2024, I had a chance to go to Pascagoula's Law Library to study these four cases. I sent EEOC the following additional response to these four cases since EEOC was still conducting investigation of my charge filed on June 7 or 2023 and amended on July 12 of 2023.

The following are the titles of these four cited cases, followed by my response by comparing to my case.

Hernandez v. Crawford Bldg. Material Co., 321 F.3.d 528 (5th Cir. 2003).

My response: Crawford dismissed Juan Hernandez because of dissatisfaction of Hernandez's performance, not due to discrimination. As compared to my case, I had performed excellently with official documentations.

Black v. Pan Am. Labs., L.L.C., 646 F.3d 254, 259 (5th Cir. 2011)
My response: This is a case of discrimination based on sex and retaliation. Sex-based animus is similar to age-based animus. A prima facie case was established by Carleen Black against her employer Pan Am Laboratories. As compared to my case, I also have established a prima facie case since I met the four conditions required for discrimination.
St. Mary' s Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993)
My Response: Correctional officer Melvin Hicks was demoted for non-discriminatory reasons. This is not relevant to my case, as I pointed out that my performance had been excellent.
Thomas v. Tex. Dept. of Criminal Justice, 220 F.3d 389, 394 (5th Cir. 2000)
My response: Beverly Thomas worked for Texas Department of Criminal Justice (TDO) and she was denied housing opportunity and further promotion opportunity based on gender, race and retaliation. The Appeal Court of the US Southern District of Texas upheld all, except one, of these claims by Ms. Thomas due to facts. I believe that I have established facts for a prima facie case for all my claims. As compared to this case, I had filed retaliation claim in details to MSU administration as described in my response above to that described on page 7 of the MSU position.

Please note none of the four cited legal cases are relevant to the university environment. US university systems are different from the situations/environments of these four cases. In general, universities handle discrimination appeals using detailed due process requirement for faculty members, particularly tenured faculty; this, MSU failed to do. MSU did not allow me a due process for resolving my complaints.

3.     Summary of Patterns of Discrimination
I have not divided national origin, race and age discriminations into separate sections since they are deeply intertwined in my case.  MSU engaged in a pattern of discriminatory behavior based on my national origin, race and age, including, but not limited to:
(a)     Intentionally widely broadcasting my confidential performance review to all faculty, staff and visitors through e-mail distribution in the Department of Food Science, Nutrition and Health Promotion (FSNHP) when I served as the professor and head in 2014. This was an unfavorable disparate treatment that never happened to a department head/faculty of a white race.
(b)     Exclusion me from key meetings and departmental decision-making processes in my home department, by singling me out intentionally from faculty e-mail groups for several years. The plaintiff was the only Taiwanese faculty from Taiwan, in the department.
(c)     Denial of hiring and purchasing equipment by me that had been pre-approved by the Dean Willard without giving any explanations.
(d)     Unwarranted termination of my ESPL Director position in the middle of the contract year, that was granted the position to a non-qualified professor with no-experimental seafood processing expertise, younger, white-race faculty. The termination was callously carried out despite my documented outstanding performance and the fact the Dean said that I had done well in the last four years.
(e)     Corroborating with the 'Emeritus' status offer, the Dean encouraged me to retire by associating with my personal character (love for gardening) and by reducing my workload, implying discrimination against me on the basis of age.
(f)     Terminating my Project Director/Principal Investigator role for a federal research project on catfish and seafood processing in the middle of the contract period that was authored by me, and awarded to me, and granted it to a non-qualified for experimental research, younger, non-minority (white) colleague (Dr. James Henderson).
(g)     Presenting contradictory statements between VP Coble and Dean Willard in the assignment of my duty as a PI or co-PI for a large USDA-catfish project.
(h)     Giving more technical support staff in the USDA-catfish project to a co-PI of much younger staff with much less qualifications, showing disparate treatment and age discrimination.
(i)     Violating MSU's policy of proper research conduct in the assurance of research integrity and equal opportunity, by replacing my PI/PD role with a white person without catfish/seafood qualifications.
(j)     Disregarding my ownership (authorship, credit, intellectual property) of serving as the PI and

gave my supervisory role to a non-faculty staff of other race/ethnicity/country origin, making the work environment unfavorable for me to carry out the project.

(k)     Offering by the Dean of a 'Director-Emeritus' position (age-related) with a concomitant reduction in workload, despite my expression that I was not ready to retire, making me feel unworthy.

(l)     Making exaggerated, unsubstantiated, serious allegations/comments on my supervising ability and collegiality issues that had never been documented with factual materials of time/date, incidence nature, witnesses and actions taken by administration against me.

(m)     Denial of my requests for a meeting to discuss micromanagement and other personnel issues with upper administration.

(n)     Denial of a fair, due process of a faculty committee to conduct hearing of my discrimination and retaliation complaints, a violation of the due process principle.

(o)     Conducting internal investigation of my complaint in a biased and intimidating manner, only by administrators with reporting line directly or indirectly to the President.

(p)     Divergence from the internal investigation policy and procedures, and taking excessively longer time to complete - a violation of the time limitation.

(q)     Asking me unfairly to take the demotion as an opportunity of a reduction of burden of a leadership, for which I worked very hard.

(r)     Adding an unsubstantiated negative comment of a personnel management issue in my annual work review that was not reflective of my performance after I filed my grievance, showing heightening scrutiny.

(s)     Marginalizing me by asking me only to review articles for my time that constituted disparate treatment since no faculty had been treated this manner.

(t)     Disliking me in an unprofessional manner at certain circumstances, making me feel unworthy.

(u)     Making decisions for the use of a federal grant without seeking input from me as a co-PI.

(v)     Displaying an insulting motive for age discrimination by giving staff-supervision role for a competitive soymilk grant to a much younger person with much less qualification.

(w)     Implementing multiple adversary actions (intentional disparate treatments) created severe 'chokehold' to deter my continuous career development. No one had been treated this way.

(x)     Victimizing me by not being allowed to supervise any personnel. Nothing I do would make a difference in MSU's mindset.

4.     Summary of Patterns of Retaliation

After I reported the discriminatory actions, MSU engaged in a pattern of continuous retaliatory conduct, including, but not limited to:

(a)     Excluding me totally from the supervisory roles (a reduction of my workload) by giving my supervisees to another person of lower rank and qualification, making the environment hostile to me.

(b)     Assigning me less favorable tasks, simply to review articles.

(c)     Excluding me from the decision-making process in the USDA-ARS catfish project, in which I serve as a co-principal investigator (co-PI).

(d)     Issuing negative comments in performance evaluation, particularly in personnel management arenas, that were not reflective of my actual work performance.

(e)     Allowing other researchers to work on my research project without giving credits in the authorship of the publications.

(f)     Eliminating my supervisory faculty right to direct a postdoctoral researcher hired by a federal competitive grant secured by me, the Project Director, making the job situation less favorable and that has caused damages to the progress of my research project.

(g)     Lying about the personnel management issues repeatedly and illustrating unfounded, vindicated collegiality issues that formed the pretext for the removal of my directorship and reduction of workload after I filed my discrimination claims.

(h)     Giving lower (minimizing) annual pay raise despite my annual performance was outstanding.

(i)     Making horrific threat to terminate my position based on unfounded claims of my misbehavior, despite my outstanding performance and reputations in the nation and the world.

(j)     No corrections made after EEOC charge for discriminations and retaliations, which continue to heighten to make it impossible for me to perform my project, making me a pervasive sense of

helplessness and depression.

5. Cause of Action: Race and National Origin Discrimination in Violation of Title VII
5.1 Plaintiff incorporates by reference the allegations in sections 1 through 4 as if fully set forth herein.
5.2 Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e-2 to 2000e-17, prohibits discrimination based on national origin, race, and ethnicity.
5.3 Defendant, Mississippi State University, discriminated against Plaintiff by treating Plaintiff less favorably than similarly situated colleagues who were not of Plaintiff's race, ethnicity, or national origin, and by making untruthful, invidious remarks about Plaintiff's personal behavior and management ability.
5.4 As a result of Defendant's discriminatory conduct, Plaintiff has suffered economic and non-economic damages, including emotional distress and harm to Plaintiff's career.

6. Cause of Action: Age Discrimination in Violation of the ADEA
6.1 Plaintiff incorporates by reference the allegations in sections 1 through 4 as if fully set forth herein.
6.2 The Age Discrimination in Employment Act (ADEA) of 1967, as codified, 29 U.S.C. §§ 621 to 634, prohibits employers from discriminating against employees over the age of 40 based on age.
6.3 Defendant, Mississippi State University, discriminated against Plaintiff by treating Plaintiff less favorably than similarly situated younger colleagues and by removing Plaintiff's leadership position, supervisory roles and further professional opportunities based on Plaintiff's age. The Defendant made an offer of 'Emeritus' status and encouraged Plaintiff to retire to do gardening.
6.4 As a result of Defendant's discriminatory conduct, Plaintiff has suffered economic and non-economic damages, including emotional distress and harm to Plaintiff's career.

7. Cause of Action: Retaliation in Violation of Title VII and the ADEA
7.1 Plaintiff incorporates by reference the allegations in sections 1 through 4 as if fully set forth herein.
7.2 Title VII, 42 U.S.C. § 2000e-3(a), and the ADEA, 29 U.S.C. § 623(d), prohibit employers from retaliating against employees for engaging in protected activities, such as reporting or opposing unlawful discrimination.
7.3 Plaintiff engaged in protected activities by reporting the discriminatory treatment based on Plaintiff's national origin, race, ethnicity, and age to Civil Rights Compliance Office/HR/University administration.
7.4 In retaliation for Plaintiff's complaints, Defendant took adverse employment actions against Plaintiff, including excluding Plaintiff from projects, assigning less favorable work, issuing negative performance evaluations, and threatening Plaintiff's job security.
7.5 As a result of Defendant's retaliatory conduct, Plaintiff has suffered economic and non-economic damages, including emotional distress and damage to Plaintiff's professional reputation.

8. Conclusion
MSU's exaggerated allegations were not made in good faith, only after my filing of the discrimination complaint to victimize my personal character. MSU proffered the non-factual allegations of my behavior that lacked basis and were in fact a pretext with an aim to conceal their intentional discrimination acts.
I believe I have built a prima facie case by meeting four federal requirements: (i) that I belong to a racial minority from Taiwan, a member of the protected class; (ii) that I had done very well in this position for more than four years before termination; (iii) that, despite my excellent food science qualifications, experience, and performance evaluation, I was terminated; and (iv) that after my termination, the position was given to a substantially younger, white, US-born forestry economist with no qualifications for the Experimental Seafood Processing. In addition, after my directorship position change, MSU gave my research project and supervisory roles for multiple projects to much younger persons born in the US or China with less qualification, showing additional discrimination on the basis of race, age and national origin.
MSU's discriminatory and heightened retaliatory conduct created a hostile work environment that was pervasive and has severely damaged my ability to succeed in my academic career. MSU's punitive

actions against me have gone so extreme that they are way beyond the commonly acceptable boundaries of administrative practice in universities that reflects a hatred mentality. As a direct result of MSU unlawful actions, I have suffered severe emotional distress, damage to professional reputation, lost wages, and missed career advancement opportunities.

I believe justice is for all. That is why I am humbly submitting this complaint for your consideration. Thank you very much for your consideration. Please let me know if you need more information from me.

Attachment A is the original charge submitted to EEOC on June 7, 2023.
Attachment B is the amended charge submitted to EEOC on July 12, 2024.
Attachment C is the letter of 'Right to Sue' from DoJ and EEOC issued on August 26, 2024.
Attachment D is the Objection Letter sent to Dr. Henderson regarding supervisory role and others.
Attachment E is the Expert testament from Dr. Lowell Satterlee regarding assigning my supervisee to a younger person with less experience.
Attachment F is the two e-mails of appreciation of Dr. Devandra Bhandari at resignation.
Attachment G is a testimony of my character and appreciation from Sarah Warren before her departure.
Attachment H is my official response to MSU position submitted to EEOC, containing my original grievance at MSU with many exhibits.

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.   Exhaustion of Federal Administrative Remedies

A.      It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

June 7, 2023 and amended on July 12, 2023

B.      The Equal Employment Opportunity Commission *(check one)*:

☐      has not issued a Notice of Right to Sue letter.

☒      issued a Notice of Right to Sue letter, which I received on *(date)* _____ .

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.      Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☒      60 days or more have elapsed.

☐      less than 60 days have elapsed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

1. Salary and benefit damages of about $30,000 for wrongful termination of my ESPL directorship.
2. $3 million of punitive damages for defamation, retaliation and the high mental distress that has hampered my health and for the deterrance in my career development for more than 10 years.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.  For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  10/28/2024

Signature of Plaintiff  *Kow-Ching Chang*
Printed Name of Plaintiff  Kow-Ching Chang

### B.  For Attorneys

Date of signing:

Signature of Attorney
Printed Name of Attorney
Bar Number

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Name of Law Firm \
Street Address \
State and Zip Code \
Telephone Number \
E-mail Address