**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**KOW-CHING CHANG**                                                      **PLAINTIFF**

**v.**                                                      **CIVIL NO.: 1:25-cv-0017-MPM-RP**

**MISSISSIPPI STATE UNIVERSITY**                                      **DEFENDANT**

**ORDER**

This cause comes before the court on the motion of defendant Mississippi State

University (MSU) to dismiss the claims against it on summary judgment, pursuant to Fed. R.

Civ. P. 56.  The *pro se* plaintiff Kow-Ching Chang has responded in opposition to the motion,

and the court, having considered the memoranda and submissions of the parties, is prepared to

rule.

This is a Title VII national origin discrimination and retaliation action involving

administrative actions taken by MSU against plaintiff based on what it found to be instances in

which he bullied and behaved in an unprofessional manner towards individuals under his

supervision.  Chang, a 72-year-old Taiwanese-American male, is employed by MSU as a tenured

Professor within the MSU Coastal Research and Extension Center's ("the Center")

Experimental Seafood Processing Laboratory.  ("the Seafood Lab")  [Compl. at p. 6.]  Although

Chang remains an MSU employee today, he filed this lawsuit based primarily upon a decision to

remove him as the Seafood Lab's Director and to otherwise restrict his supervisory activities.

MSU contends that its decision to remove plaintiff from this position resulted from the fact that

"a number of people under Chang's supervision have made serious complaints about Chang

1

regarding alleged aggressive and, at times, abusive tendencies." [Brief at 1-2]. While plaintiff appears to acknowledge that complaints were, in fact, made against him, he insists in his complaint that "all behavioral allegations were not factual and [were] only compiled after I submitted the internal discrimination claims." [Complaint at 11].

This court notes that, in a June 10, 2025 order, it dismissed the ADEA age discrimination claim asserted by plaintiff on the basis of the Eleventh Amendment immunity enjoyed by MSU as an "arm of the state." In so ruling, this court wrote that:

> It is well settled that MSU is an arm of the State of Mississippi, and, as such, the Fifth Circuit has held that it is fully entitled to assert Eleventh Amendment immunity. *Jagandan v. Giles*, 538 F.2d 1166, 1173-78 (5th Cir. 1976). Moreover, the U.S. Supreme Court made it clear in *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000) that Congress did not abrogate Eleventh Amendment immunity by enacting the ADEA. Finally, the Fifth Circuit has specifically found that the State of Mississippi has not waived its Eleventh Amendment immunity with respect to the ADEA. *McGarry v. Univ. of Miss. Medical Center*, 355 Fed. App'x 853, 856 (5th Cir. 2009), citing Miss. Code. Ann. § 11–46–5(4) ("Nothing contained in this chapter shall be construed to waive the immunity of the state from suit in federal courts...."). Considered together, this precedent makes it clear that plaintiff's ADEA claims in this case are barred by Eleventh Amendment immunity.

[Slip op. at 3]. While dismissing plaintiff's ADEA claim, this court determined that it should wait until the presentation of evidence developed during discovery to address the merits of his Title VII discrimination and retaliation claims. That discovery has been completed, and this court now turns to the merits of the summary judgment issues relating to plaintiff's Title VII claims.

While it is clear that plaintiff's decision to assert Title VII claims allows him to bypass Eleventh Amendment immunity, *see Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), this court notes that sovereign immunity continues to cast a shadow over the arguments and claims which he is able to make in this case. For example, plaintiff takes issue in his briefing with the procedures followed by defendant in taking disciplinary action against him, but such arguments are

2

generally made in the context of a procedural due process claim asserted under 42 U.S.C. § 1983. Asserting such a procedural due process claim against MSU is not an option for Chang, however, since the law is clear that § 1983 claims are, like his ADEA claim, barred by Eleventh Amendment immunity. *See Quern v. Jordan*, 440 U.S. 332 (1979).

That leaves Title VII as plaintiff's sole available remedy against MSU, but this court must wonder whether plaintiff's decision to assert a Title VII discrimination claim reflected a genuine belief on his part that he was discriminated against on the basis of his Asian ancestry or whether it simply reflects a realization on his part that he had no other legal claim available to him against MSU. In so stating, this court notes its belief that, on a common-sensical level, plaintiff's ADEA claim was considerably more plausible, on its face, than his Title VII discrimination claim. This is largely because plaintiff was a seventy-year old man during the relevant events in this case, and he had obviously gotten older during his tenure at MSU. This court believes that individuals in their seventies do frequently face workplace discrimination, and, were it not for the Eleventh Amendment's bar, it might well have initially wondered whether age was a factor in the treatment he received in this case.[1] This same initial appearance of plausibility does not extend to plaintiff's Title VII national origin claim. Indeed, MSU was well aware that plaintiff was of Asian descent when it hired him, and, that being the case, any argument that the treatment he received was based on his ancestry faces serious plausibility concerns. This is particularly true considering that, as discussed below, most of the co-workers whom plaintiff is alleged to have bullied were likewise of Asian descent.

---

[1] This court hastens to add that any such initial suspicions would have been quickly dispelled once it reviewed the evidence of misconduct against plaintiff, discussed below.

3

Having reviewed the record in this case, this court has no reason to suspect that MSU had any reluctance to hire individuals of Asian descent to work at the Center, indeed, the record rather strongly suggests otherwise. Moreover, the record includes very strong proof of misconduct on the part of plaintiff in his supervision of lab employees, so much so that this court frankly wonders why it took MSU so long to remove his supervisory authority. In describing its proof in this regard, MSU writes in its brief that:

> Almost immediately after Chang became Director of the Seafood Lab, MSU began to receive complaints about his conduct. In April 2018, less than three months after Chang's service began, Marla Lacy (a White female) contacted Dr. James Henderson, the Head of the Center, to complain that she did not feel safe being around Chang. Lacy described working with Chang as "like being in a mentally abusive relationship, only it is my boss who is the aggressor" [sic] and stated that she could "only explain [Chang's conduct] as being[] dictator like," adding that her "only wish is to feel safe at work." Ex. 1, Henderson Dec., ¶ 5; Ex. 6, Apr. 20, 2018 Lacy Email. Ten days later, Lacy resigned her position rather than face Chang's continued aggression. Ex. 7, Apr. 30, 2018 Lacy Resignation.

[Brief at 3].

MSU has submitted a copy of the April 20, 2018 email which Lacy sent to Henderson, and it fully supports defendant's description of the evidence. In her email, Lacy informed Henderson that:

> I would like to request a formal meeting with you about the work environment at the Pascagoula location. Also, l would like to request to move my desk to the classroom area of the building, and communicate with Dr. Chang only through email until the work environment is better.
> I do not feel safe at the office when Dr. Chang is on site. When I say I do not feel safe, that means no physical harm. I can only explain it like being in a mentally abusive relationship, only it is my boss who is the aggressor. Dr. Chang has two sides. One is the very grateful dignitary, in which he expresses pleasantries, the other is (I can only explain it as being) dictator like. I truly understand the pressure he is under to have grant money spent and the lab up and running. This does not mean in any way to treat anyone with the disrespect he shows to the staff at our location. If l learned anything about working with children and adults is a simple gesture, you show them respect and make them feel comfortable, they will move mountains for you; however make them feel threatened and they shut down. Dr. Henderson, I have shut down at this point. No one should feel this way at work.

4

My last request is to be transferred to any other opening we may have that I am qualified for. My only wish is to feel safe at work.

[Exhibit 5 at 1-2].

Defendant has also submitted a resignation letter submitted by Lacy to Henderson ten days later, in which she wrote:

Please accept this as official notice of my resignation. As you know, over the last couple of months, we have had many meetings and discussions regarding the work environment at the Pascagoula, Mississippi Experimental Seafood Processing Laboratory location. Our conflict at the Pascagoula location has affected my ability to communicate properly affecting my day to day task, and has left me feeling uncertain about the future of any resolution. It is clear to me that Or. Sam Chang and I will not be able to resolve our differences. Therefore, I feel that resigning is the best option for me. I understand that not all locations at The University of Mississippi operate under these conditions, and would love to be considered to apply for other opportunities.
My last day at Mississippi State University will be May 11, 2018. I ·would be happy to meet with you at your convenience to discuss the transition of my duties to my successor.
Sincerely, Marla Lacy

[Exhibit 7 at 1].

Aside from Lacy's complaint, defendant has submitted summary judgment evidence that on February 27, 2020, Janice Nichols, an employee in the Center's Biloxi office, emailed MSU Human Resources Management ("HRM") representative Juli Rester to report incidents involving Chang which had been reported to her. Ex. 8, Feb. 27, 2020 Nichols Email to Rester. Among other things, Nichols reported that she had been visited by Seafood Lab employee Dr. Yuwei Wu, who told her that, in November 2019, Chang had yelled at a visiting scholar named Dr. Haijuan Tian to the point that Dr. Tian had been brought to tears and even became suicidal. Specifically, Nichols wrote in her email to Rester that:

Yuwei also told me additional information on a situation that happened last November at the Seafood Lab. We have a visiting scholar from China. Her name is Haijuan Tian. Tian was to do an experiment and it was not done in the time frame that Dr. Chang wanted it done. He then proceeded to yell at her. It was not communicated to me as to what was said but she was brought to tears and crying very hard. Jesse Raley, maintenance tech, had told me of the incident when it happened and said he talked to Tian afterwards to try

5

and calm her down. She left the lab and did not return the next day. Yuwei shared with me this morning that when this happened he had to take Tian to the hospital that night because she was suicidal. He said that this really scared him and he was concerned. Yuwei stated that he does not think that Dr. Chang can control his anger or his yelling. He said that he is a nice person but that when he is talking to staff he can't control himself He also stated that Dr. Chang makes it very clear all of the time that he is the boss and that they are beneath him. The way that he was talking it makes me think that it is constantly throughout every day that he is there at the lab.

[Exhibit 8 at 1].

MSU has submitted contemporaneous evidence suggesting that it took the complaints against plaintiff very seriously and that it was these complaints, and not plaintiff's ancestry, which motivated it to limit his responsibilities. In its brief, defendant notes that "a day after Nichols's email, then-MAFES Director Dr. George Hopper held a video conference meeting with Chang, which Dr. Hopper summarized in an email to Chang later that day." [Brief at 4]. Defendant has submitted a copy of Hopper's email to Chang, which reads as follows:

> This email is to confirm our meeting today, February 28, 2020, at 10:00 a.m., via video conference regarding your communication and personnel management.
> I am concerned about the work environment at the Seafood Lab. There have been instances where you have communicated to MSU employees and Visiting Scientists in a manner that is unprofessional, intimidating, and bullying. In this meeting today, you have been put on notice that your inappropriate behavior must cease and desist and you must not retaliate against anyone. If there are any indications, perceived or otherwise, that you have retaliated, further disciplinary action will be taken, up to and including termination. MSU-Human Resources Management will be conducting a full investigation.
> George Hopper

[Exhibit 9].

This court believes that Hopper's email offers powerful support for MSU's position that the actions it took against plaintiff were motivated by genuine – and entirely appropriate - concerns regarding the complaints levied against him.

Defendant has submitted yet another highly damaging email against plaintiff, in the form of a March 9, 2022 email to Dr. Henderson from Seafood Lab employee Dr. Yuwei Wu who is,

6

like Chang, an Asian male of Taiwanese national origin.  In that email, Dr. Wu explained how

he, like Lacy, felt compelled to resign based on Chang's conduct.  In that email, Dr. Wu

explained to Dr. Henderson that:

> My plan was working for Mississippi State University until I retire, but the misconducts, sex harassments and verbal intimidation happening in Dr. Sam Chang' s lab have left me no option but to leave my job. I am so sorry to see that Sam Chang, who has been forced to leave North Dakota State University for the same reason, has failed to correct himself in Mississippi State University.
> As far as I know, the first victim was a visiting scholar Dr. Tian in 2019. For unknown reason Dr. Sam Chang yelled at and conducted verbal harassment to Dr. Tian during her stay in the lab, stopping her from using PPE (personal protection equipment) in the name of saving lab supply, and had exposed her to hazardous chemical environment. This caused Dr. Tian's sickness and her seek for medical assistance. The doctor told me that close attention must be paid to Dr. Tian for the intimidation that had created her suicidal risk.
> The day after Dr. Chang knew her doctor visit, he called on everyone to his office, closed doors and threatened me that my job security is based on whether he stays or not in his position of director, and I will have "very bad times" if anything happened to him. As influenced by Dr. Chang, I only reported to school that this incident happened lack of PPE. Later I found out all the things happened and should be condemned in the lab, were known by every lab member, but no one dared to speak it up as "losing degrees, losing jobs, or getting a warning" are frequently mentioned by Sam Chang to intimidate them. Another sex harassment victim (name and evidence will be provided upon request) told me about Dr. Chang's frequent purposely touching of her body, asking her to go to his house alone with him, and repeatedly verbal threatening, which created utmost fear to her and led her to seek psychological medication. Dr. Chang's behaviors towards female are also well-awared by colleagues in the lab, quoting "Dr. Sam Chang likes touching female students' hand and upper arms", the students include visiting scholars, students in his class and even who are only taking oral exams.
> Dr. Sam Chang's misconduct also includes asking students to arrange and pay for his travel to China. Evidence of the above statements includes chat records with the victims are available, and victims did also tell Yan and David. I hope my leaving and calling for an investigation would stop more person from being victims of Sam Chang.
> My last day with MSU will be March 18, 2022.
> Truly yours,
> Yuwei Wu

[Exhibit 12 at 1-3].

The summary judgment record includes yet another emailed complaint about plaintiff

which was sent to MSU in March, 2022 – the same month as Dr. Wu's complaint.  In his own

email to Dr. Henderson, Dr. Seongbin Park also complained to Dr. Henderson about Chang's "bullying" and expressed his fear that "I currently feel like I am the next target after Dr. Wu's leave." [Exhibit 13 at 1]. Dr. Park's email appears to suggest that plaintiff regarded Dr. Wu as his enemy in light of his complaint against him and that he was searching for Wu's friends at the Seafood Lab in order to retaliate against them. In his email to Dr. Henderson, Dr. Park stated that he felt compelled to falsely deny being friends with Dr. Wu in order to protect himself, writing that:

> And then this afternoon, [Dr. Chang] told me "I think you and Dr. Wu are friends with each other." I should tell him "I am not his friend." And then he said "I think you have visited his house several times". And I denied again. I couldn't help telling him a lie to protect myself from that threat. To be honest, I was afraid of him about what if he would harm me using his power. And now it makes me feel self-destructive.

*Id.* Like his co-workers before him, Dr. Park requested that Dr. Henderson allow him to transfer to a position where he would not be under plaintiff's supervision, writing that:

> I had been thinking of quitting my job position when [plaintiff] threw my manuscript into a garbage can in front of me last year. At that time, thanks to Dr. Wu, he tried to counsel me of the worries and anxieties I got from Dr. Chang. * * * I sincerely hope you may arrange for me to go to a different place to work for MSU if possible."

*Id.*

This court regards these emails relating to plaintiff's alleged bullying as being quite powerful evidence, for multiple reasons. First, the sheer volume and (apparent) credibility of the complaints against plaintiff renders defendant's summary judgment evidence regarding its reasons for disciplining plaintiff as some of the strongest which this court has encountered, in any discrimination case. Second, the emails do not depict simple personality conflicts or minor disagreements among co-workers, but, rather, allege deficiencies in plaintiff's supervisory skills which were, allegedly, serious enough to lead multiple employees to resign or seek transfer and another to become suicidal. Clearly, these are deficiencies which would be taken very seriously

by any responsible employer. Third, as contemporaneous communications, the emails appear to

reflect the very genuine concerns expressed by plaintiff's co-workers at the time and do not

constitute self-serving testimony made after litigation had commenced. Finally, the names of the

employees involved clearly reflect their Asian descent, which, once again, demonstrates that

individuals with such ancestry were strongly represented at the Seafood Lab.

In explaining the actions which it took in response to these complaints, defendant writes

that:

> MSU administrators ultimately decided during July 2022 to limit Chang's supervisory authority while they continued to examine his conduct and consider the future of the Seafood Lab. On August 19, 2022, after further consideration, Dean Willard again met with Chang to discuss Chang's removal as Director of the Seafood Lab. During that discussion, Chang was presented with a conditional letter that effected his removal as Director, but it was agreed that Chang could resign from the position instead; it was agreed that, should Chang fail to confirm his resignation, the conditional letter concerning his removal would be in effect. Chang agreed to resign from that leadership role effective December 31, 2022.

[Brief at 11]. In explaining the decision to remove plaintiff from his position as Director of the

Seafood Lab, Dr. Henderson stated that:

> Dr. Chang's removal was based on documented complaints from Marla Lacy, Dr. Yuwei Wu, Dr. Haijuan Tian, Dr. Benny Park, and other complaints documented through internal MSU correspondence and investigations. The reports occurred over multiple years, both before and after explicit warnings, and they caused me significant concern regarding Dr. Chang's leadership and staff management.

[Exhibit 1 at 3].

It should be clear from this court's comments above that it finds MSU's actions described

above to be fully justified, and, to reiterate, it merely wonders why such action was not taken

sooner.

In opposing summary judgment, plaintiff writes in his brief that:

> After Plaintiff reported discriminatory treatment in May 2021, senior leadership directed an "ethics check" on Plaintiff rather than investigating his complaint, and thereafter

> imposed progressively escalating restrictions culminating in the complete removal of all supervisory authority. (,r56.85, 56.17, 56.112.) Although Defendants contend that decisions predated Plaintiff's protected activity, the Rule 56 record reflects adverse actions were imposed only after Plaintiff's May 2021 complaints. (,r,r56.85-87, 56.11, 56.112). **On August 19-20, 2022, Plaintiff was informed that he must resign effective December 31, 2022 or face immediate termination.** (,r56.1 1 ). The supervisory restrictions were not temporary or corrective but continued to be enforced thereafter. (,r56. l 12).
>
> Decisionmakers acknowledged that this total removal of supervisory authority was an extraordinary action taken without identifying a specific factual basis supporting such severity. (,r56.77.) The Rule 56 record further shows that two white, younger administrators who lost directorship roles were permitted to retain their supervisory authority, while Plaintiff alone was subjected to the unprecedented elimination of all supervisory responsibilities. Evidence of advance succession planning around Plaintiffs anticipated retirement, combined with escalating restrictions based on unverified complaints and the absence of documented misconduct, permits a reasonable jury to conclude that the adverse outcome was effectively determined in advance and later justified through post hoc explanations. **(,r,r56.5,** 56.103-104, 56.109-115, 56.120)
>
> Defendants contend that their actions were based on concerns regarding professionalism and collegiality. The summary judgment record, however, reflects decisionmaker testimony acknowledging the absence of formal findings, reliance on unverified complaints, departures from normal procedures, and escalating actions following Plaintiffs protected activity.

[Brief at 1-2].

In the court's view, plaintiff's rather dry and legalistic arguments fail to adequately confront the extreme severity of the emotional abuse which he is alleged to have inflicted upon lab employees. Simply stated, co-workers do not seek medical care or choose to resign on the basis of anything but the most severe mistreatment from a supervisor, and entirely consistent reports of abuse from multiple highly educated employees strike this court as constituting extremely strong proof of misconduct, which plaintiff has failed to adequately confront in his brief. Moreover, even if this court were to (very generously) conclude that fact issues exist regarding whether plaintiff actually supervised lab employees in an abusive and bullying manner, this would still not serve to defeat defendant's summary judgment motion. This is because, in the Title VII context, the crucial issue is not whether the abusive behavior actually

10

occurred, but, rather, *whether MSU's disciplinary actions against plaintiff were motivated by a genuine belief that they did occur.*

Having carefully reviewed the record in this case, this court has no doubt that the actions which MSU took against plaintiff were, in fact, based upon the reports of misconduct against him, and not on the basis of national origin discrimination or retaliation for any claims of discrimination made by plaintiff. That is the key issue in any Title VII discrimination or retaliation claim. Moreover, while plaintiff has raised a number of tangential arguments in his briefing, this court believes that those arguments are quite adeptly refuted in MSU's briefing. This court incorporates and adopts those arguments here, since it frankly does not regard plaintiff's claims in this case as being worthy of extensive discussion and is unsurprised that he was (apparently) unable to secure counsel to prosecute them.

In concluding that it should not address plaintiff's arguments at length, this court notes that his briefing is in blatant non-compliance with Local Rule 7(b)(5), which provides that "respondent's memorandum brief may not exceed 35 pages." Plaintiff has submitted a "Part I" and "Part 2" of his memorandum brief, the first of which is 45 pages, and the second of which is 39 pages. [Docket entry 89]. Needless to say, this does not even come close to complying with the 35-page limitation set forth in the local rules, and this court believes that it would be entirely justified in striking plaintiff's submissions outright. This court will, perhaps generously, refrain from doing so, even though much of plaintiff's briefing appears stylistically very similar to AI-generated briefing which it frequently encounters from *pro se* plaintiffs in this district. Even assuming that plaintiff wrote his brief himself, it is, to reiterate, in blatant non-compliance with the local rules, and, even more importantly, does not serve to alter this court's above-stated impressions regarding the weight of the accusations against him. This court likewise agrees with

11

defendant that a number of claims asserted by plaintiff are either untimely or outside of the scope of his EEOC charge, but, ultimately, it concludes that those claims would lack merit even if they were procedurally proper.

This court has explained its reasons for concluding that plaintiff's claims lack merit above, but it will briefly elaborate upon those reasons in the context of the *McDonnell Douglas* framework which governs this summary judgment motion. It is well settled that "[a]n employee may rely on direct or circumstantial evidence to establish a prima facie case of discrimination under Title VII." *Arredondo v. Schlumberger Ltd.*, 583 F. Supp. 3d 783, 800-01 (W.D. Tex. 2022) (citing *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007)). Here, Chang lacks direct evidence of discrimination. Thus, the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* applies. 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under the *McDonnell Douglas* framework, the burden is first on the plaintiff to create a presumption of discrimination by establishing a prima facie case. *Id*. at 802, 93 S. Ct. 1817. If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. *Id*. "The burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) *(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).* If the defendant satisfies its burden of production, then the ultimate burden rests on the plaintiff to prove the employment decision was the result of a discriminatory practice. *McDonnell Douglas,* 411 U.S. at 804, 93 S. Ct. 1817.

To establish a retaliation claim under Title VII, a plaintiff must prove that he or she (1) engaged in activity protected by Title VII, (2) the employer took adverse employment action

against the employee, and (3) there was a causal connection between the protected activity and the adverse employment action. *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 757 (5th Cir. 2017) (citing *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015)); *see Parker v. Louisiana Dept. of Educ. Special Sch. Dist.*, 323 F. App'x 321, 327 (5th Cir. 2009) (applying *McDonnell Douglas* framework). Ultimately, Chang would have to prove his retaliation claim under a but-for causation analysis. *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020); *Univ. of Texas Southwest Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 133 S. Ct. 2517, 186 L. Ed. 503 (2013). In other words, he must show that the unlawful retaliation would not have occurred in the absence of the alleged protected activity.

A plaintiff may prove a retaliation claim either by direct or circumstantial evidence. When, as here, a plaintiff lacks direct evidence of discrimination, courts apply the *McDonnell Douglas* burden-shifting framework, already discussed above. *Thomas v. Johnson*, 788 F.3d 177, 179 (5th Cir. 2015) (internal citation omitted). While a plaintiff may meet their burden of causation at the prima facie stage by simply showing temporal proximity between protected activity and the adverse employment action, the defendant's production of a legitimate, non-discriminatory reason for the action places the burden back onto the plaintiff to prove the proffered reason is pretextual. *Brown*, 969 F.3d at 577. "Ultimately, in order to survive a motion for summary judgment, a plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Brown*, 969 F.3d at 577 (quoting *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019) and *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012)) (additional internal quotation marks omitted).

13

In the court's view, both plaintiff's discrimination and retaliation claims are defeated by the "pretext" prong of the *McDonnell Douglas* standard, if not sooner.[2] This is because the record in this case strongly supports defendant's argument that the actions which it took against plaintiff were motivated by the extremely serious – and seemingly entirely credible – reports which it received against him. Indeed, if this court were to place itself in the position of MSU administrators receiving the reports of bullying made by multiple employees, then it would struggle to even come up with an argument in favor of allowing plaintiff to continue in a supervisory position. This court further notes that the timing of MSU's decision to limit Chang's supervisory authority in July 2022 and its decision to remove him as Director in late 2022 is entirely consistent with a careful investigation of his conduct being conducted after the latest reports against him were received from Drs. Wu and Park in March 2022. Indeed, it seems clear that this temporal proximity is much closer than plaintiff alleges in his brief with regard to his retaliation claims. In his brief, plaintiff rather vaguely writes in regard to his retaliation claim that:

> Plaintiff reported discrimination and micromanagement in May 2021. (1156.85-90). The record reflects a sequence of progressively escalated restrictions, culminating in removal of supervisory authority and a forced resignation effective December 31, 2022, followed by continued enforcement of restrictions in 2023.

[Plaintiff's brief at 23].

The vagueness of plaintiff's description of his alleged protected activity aside, this court agrees with defendant that a gap of fourteen to fifteen months is too long to support a retaliation inference under Fifth Circuit precedent. Indeed, the Fifth Circuit recently found that an

---

[2] Indeed, this court wonders whether an individual with plaintiff's temperament can be properly considered "qualified" to supervise employees, within the meaning of the *McDonnell Douglas* formula.

14

"approximately six-month gap between [the plaintiff's] initial EEO contact in August of 2018 and her termination in February 2019 is too long to support [her] prima facie showing," *Allen v. United States Postal Serv.,* 63 F.4th 292, 305 (5th Cir. 2023).   It thus seems quite clear that a fourteen-month gap alleged by plaintiff is insufficient to meet his prima facie case of retaliation, but, once again, this court would conclude that plaintiff had failed to demonstrate that defendant's stated reasons for disciplining him were pretexts for either retaliation or discrimination even if he had managed to meet his prima facie case.  This court therefore concludes that defendant's motion for summary judgment is well taken and should be granted.

It is therefore ordered that defendant's motion for summary judgment is granted.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

This, the 23rd day of April, 2026.


  /s/  Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI

15